# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

**v.**             **Case No. 07-20073-01/02-JWL**

**GUY NEIGHBORS and**
**CARRIE NEIGHBORS,**

   **Defendants.**

_____

## MEMORANDUM & ORDER

   The indictment in this case charges defendants Guy and Carrie Neighbors with conspiring to manufacture marijuana, being users of a controlled substance in possession of firearms, and two counts of manufacturing marijuana. In a Memorandum and Order dated November 16, 2007 (doc. #33) this court granted the defendants' motion to dismiss Count 2, which is the count charging them with being users of a controlled substance in possession of firearms, based on a violation of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* At that time, the court reserved the determination of whether to dismiss with or without prejudice until after an evidentiary hearing. That evidentiary hearing was held on November 27, 2007. At the hearing, defendants and the government presented evidence relating to the factors found at 18 U.S.C. § 3162(a)(2). After careful consideration of the evidence in light of those factors, "among others," the court finds that the more appropriate remedy is to dismiss Count 2 of the second indictment **with** prejudice

rather than without prejudice.  Consequently, the government may not file a new indictment for that charge as to either of the defendants.

## PROCEDURAL BACKGROUND

Guy and Carrie Neighbors were first indicted with being users of a controlled substance in possession of firearms on December 7, 2006, in a prior case in this court, *United States v. Neighbors*, Case No. 06-20171-CM.  After substantial time on the speedy trial clock had run, the government filed a motion to dismiss the indictment in that case on May 4, 2007, based on additional evidence that the government argued it had discovered during an ongoing investigation.  The Honorable Carlos Murguia, United States District Judge, granted the government's motion and dismissed the first indictment without prejudice.

On June 20, 2007, the government re-indicted Mr. and Mrs. Neighbors.  The second indictment included the same charge as the first indictment (as Count 2) as well as additional charges of conspiring to manufacture marijuana and two counts of knowingly and intentionally manufacturing marijuana.  On September 11, 2007, counsel for Ms. Neighbors filed a motion to dismiss Count 2 (doc. #24) in which Mr. Neighbors subsequently joined (doc. #28) based on a violation of the Speedy Trial Act.  This court granted the motion but reserved the determination of whether to dismiss Count 2 with or without prejudice until after an evidentiary hearing.  That hearing was held on November 27, 2007.  The court begins its analysis with its findings of fact from that evidentiary hearing.

2

## FINDINGS OF FACT

An investigation of Mr. and Mrs. Neighbors began around August of 2005. In fact, there have been two different investigations of these defendants. The original investigation relates to an alleged fencing and eBay fraud scheme, while the second investigation relates to the charges at issue here. Two search warrants of their residence were executed on December 2, 2005 and July 7, 2006. On December 7, 2006, they were indicted on one count of being unlawful users of a controlled substance while knowingly and unlawfully possessing firearms. In March of 2007, the case was set for trial to begin May 7, 2007, before Judge Murguia. The government presented evidence of email communications and witness subpoenas referencing that the trial was not going to begin until May 14, 2007, but defendants responded that they did not have knowledge of this.

Defendants wanted to go to trial and their attorneys were ready to do so. Ms. Neighbors testified that from the time of indictment to the time right before the trial began, she met with her attorney, Bruce Kips, for about an hour per week. Mr. Neighbors testified that he did the same with his attorney for approximately a month to six weeks before the trial was set to begin. On May 4, 2007, defendants rejected a plea agreement and also said they would not agree to a continuance of the trial. They were told if they did not agree to the continuance, they would be rearrested when the charge was refiled. The government did not file a motion to continue with the court, but instead filed a motion to dismiss the case citing additional evidence as the basis for the motion. Judge Murguia granted the motion without prejudice. On May 7, 2007, defendants were informed that the charge against them had been dropped.

On June 25, 2007, defendants were rearrested at their home and a search incident to arrest was performed.  They were not given the option to self surrender, and the government pointed out they were not treated any differently than any other defendants.  Mr. Nieghbors was taken under arrest on the first floor of the house while two female officers went upstairs and, after watching Ms. Neighbors dress, handcuffed her and placed her under arrest.  They were taken in police vehicles to court that day and counsel was appointed for them.  They were held in custody for about four to six hours.  Mr. Neighbors testified that no one asked him about his former counsel, James George, and he was not allowed to call Mr. George.  The court originally appointed Alex McCauley to represent him.  Mr. McCauley subsequently withdrew from the case due to a conflict of interest because he had formerly represented an informant in this case. No one told Ms. Neighbors it was possible that her previous attorney, Mr. Kips, could be reappointed to represent her.  In response, the prosecutor proffered that at the first appearance before the magistrate judge for the second indictment, she asked the magistrate judge's courtroom deputy clerk, Ms. Lopez, why defendants' previous attorneys were not there; Ms. Lopez said the attorneys declined to be a part of the case any longer.

The government called one witness, David Nitz, a United States Postal Inspector involved in the investigation of the Neighbors.  He testified that in a search of the Neighbors' home conducted pursuant to the first search warrant in December of 2005, officials uncovered firearms and a small marijuana grow operation.  A second search warrant was executed in July of 2006 and additional marijuana plants were recovered.  In fact, counts 1, 3, and 4 of the second

indictment correspond to the dates of the search warrant executions—December 2, 2005, and July 7, 2006.

Mr. Nitz named three cooperating individuals: Mr. Ludwig, Mr. Parsons, and Mr. Nieder. There was an initial interview with Mr. Parsons in October 2006, and another interview on April 19, 2007.  Mr. Nitz testified that on April 19, 2007, Mr. Parsons provided information relevant to the current indictment that was not previously known and that on May 3, 2007, the report from that interview was forwarded to the U.S. Attorney's office.  Mr. Nitz said that Mr. Parsons told him that in 2005 or early 2006 Carrie Neighbors asked Mr. Parsons, who had medical problems, whether he had a source for medical marijuana.  Ms. Neighbors did not say anything about whether she had a source or whether she or her husband had a need for medical marijuana.

Mr. Ludwig was interviewed May 9, 2007, and August 13, 2007.  Both of these interviews took place after the trial based on the initial indictment was scheduled to begin.  At the interview on May 9, 2007, Mr. Ludwig provided information about conversations he had with Mr. Stanwix, an employee at defendants' business who refused to be interviewed. Information received from Mr. Ludwig coincided with information from an unnamed government cooperating individual, who was interviewed April 9, 2007–that Mr. Stanwix had conversations with Ms. Neighbors about the medical uses of marijuana, that Mr. Stanwix said Ms. Neighbors' car smelled like burnt marijuana,[1] and that Ms. Neighbors and Mr. Stanwix had

---

[1] Defense counsel asked Mr. Nitz whether he asked Mr. Stanwix if that car was sometimes used by employees of defendants' business, to which he responded, no because Mr. Stanwix refused to be interviewed.

talked about how there were only three more weeks until the plants were ready.  Mr. Nitz said that the statement that the plants were about to be ready was the first indication Ms. Neighbors was personally involved in the growing operation, and that only one conclusory statement of Ms. Neighbors' use of marijuana was given to authorities prior to these interviews.  Mr. Nitz said the only relevant conversation that took place between Mr. Ludwig and Ms. Neighbors herself was when Mr. Ludwig asked Ms. Neighbors about moving to the country, building a "green house," and growing a possible "cash crop," to which Mr. Ludwig said Ms. Neighbors responded "maybe."  Mr. Nitz got this information from a report he was reading; "green house" and "cash crop" were in quotes but "marijuana" was not.  He also acknowledged that the Neighbors had Zinnias and a number of other plants in their front and back yard. On redirect he responded that the topic of conversation at the interview was marijuana.  Last, Mr. Nitz said that Mr. Ludwig told him that in 2005 he saw what he thought was marijuana vegetation in bags inside another bag, possibly a purse, behind the counter at the defendant's business.[2]

Mr. Nitz acknowledged during cross examination that two years prior to the interviews, a GPS system was attached to Mr. Ludwig's car.  He further acknowledged that at the time of these interviews in April and May of 2007, there had already been a significant amount of publicity regarding the arrest of Mr. and Ms. Neighbors.  Furthermore, Mr. Nitz said that Mr. Ludwig knew he was facing criminal charges in connection with the original investigation

---

[2] Defense counsel pointed out on cross examination and Mr. Nitz agreed that the business had, at least at times, a decent amount of foot traffic, and the area behind the waste high counter likely would have been highly visible to customers.

related to the fencing operation when he began talking to authorities about the Nieghbors'
alleged marijuana use.  Mr. Nitz also testified that they had been trying to set up the May 9
interview with Mr. Ludwig prior to that date, but it had not worked out.  When asked by defense
counsel whether he got the sense that the government was not prepared for trial, in reference to
this interview that took place after the scheduled start date of the trial, Mr. Nitz responded, "I
don't know."

Mr. Nieder was interviewed on April 12, 2006, at the Winfield Correctional Facility.  Mr.
Nitz provided no specific information regarding that interview.

Both sides presented evidence regarding the eleven firearms referenced in Count 2.  Ms.
Neighbors testified that she inherited those firearms from her father, Walter Jackson, who died
in 2003.  According to Ms. Neighbors, her father collected guns and her mother, as the
administrator of his estate, transferred the guns to her.  Ms. Neighbors intended to keep the guns
as a collection.  She knows that her father traded guns, but does not know where her father got
the guns.  She is not a collector herself, nor does she have a hunting license.  The prosecutor
asked Ms. Neighbors if she had ever bought guns from Mr. Nieder, and Ms. Neighbors
responded "never."  The government put on no evidence to refute this statement.

Mr. Nitz testified that he thought only a couple of the firearms had been traced back to
Ms. Neighbors' father.  He also said that while he was not a part of the valuations of the guns,
the one with the highest value was around six hundred dollars.  He acknowledged that he read
the value of the guns from someone else's report, that he did not have firsthand knowledge, and
he was not a firearms expert.

7

**ANALYSIS**

The Speedy Trial Act does not indicate a preference as between dismissals with and dismissals without prejudice. *See generally United States v. Taylor*, 487 U.S. 326, 334-35 (1988). The Act does, however, set out factors to be considered by the court in choosing between the two:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

18 U.S.C. § 3162(a)(2). "Prejudice to the defendant is among the 'other' factors the text of § 3162 directs the district court to consider." *United States v. Abdush-Shakur*, 465 F.3d 458, 462 (10th Cir. 2006). For the reasons explained below, upon a careful evaluation of those factors under the facts of this case, the court concludes that dismissal **with** prejudice is the more appropriate remedy here.

I.    <u>Seriousness of the Offense</u>

Count 2 of the second indictment charges the defendants with being users in possession of firearms under 18 U.S.C. §§ 922(g)(3) and 924(a)(2). Certainly, in and of itself this is a serious offense in light of the ten-year statutory maximum. *See, e.g.*, *United States v. McKinney*, 395 F.3d 837, 841 (8th Cir. 2005); *United States v. Biggs*, 419 F. Supp. 2d 1277, 1282 (D. Mont. 2006). The seriousness of the offense in this case is ameliorated somewhat, however, in light of the likely application of the sentencing guidelines to the facts of this case. Ms. Neighbors'

counsel advanced the argument that the total offense level could range from a Level 6 to a Level 14 based on the facts of this case. The defense further expanded on the basis for a Level 6 which would warrant a sentence of incarceration of only zero to six months. This argument was based on the proposition that the firearms at issue in Count 2 were a collection and defendants have no criminal history. *See* U.S.S.G. § 2K2.1(b)(2). The government argued that a sentence based on a Level 20 would be appropriate, but provided no evidence or explanation to support that position.

"The text of [U.S.S.G. § 2K2.1(b)(2)] requires a defendant to show two things: (1) that the defendant possessed all ammunition and firearms solely for lawful sporting purposes or collection' and (2) that he did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition. . . . The purpose for which the firearm is possessed is determined by the surrounding circumstances." *United States v. Sanders*, 449 F.3d 1087, 1090 (10th Cir. 2006) (internal citations omitted). For the purposes of the current motion, the court finds Ms. Neighbors' testimony that these guns came from her father's collection to be credible. She testified that they had been transferred to her by her mother, the executor of her father's estate, that she intended to keep them as a collection, that her father collected guns his whole life, and that some of the guns had never been fired. The only evidence to the contrary was Mr. Nitz's testimony about the value of the guns and that only a few were traced to Ms. Neighbors' father, but he said he had no first hand knowledge, nor was he an expert. On cross-examination of Ms. Neighbors, the government questioned her about relevant conduct that would alter the applicable sentencing guideline; Ms. Neighbors, however, denied that she had bought firearms from Mr.

Nieder at her store and the government provided no contrary evidence.  The government provided no refuting evidence of actual use by the Neighbors, criminal history associated with firearms, threats of use of the guns, or the like.

This court does not draw a conclusion about what sentence defendants would ultimately get if convicted of this charge.  But, the court does find that for purposes of this motion and hearing, the argument advanced by the defense regarding the sentencing guidelines is sufficient to decrease the seriousness of the offense as this factor is balanced here.  Additionally, the court notes the lack of any evidence concerning any criminal history by the defendants.  Accordingly, although the fact that defendants are charged with a serious offense weighs somewhat in favor of dismissal without prejudice, this factor does not weigh heavily in favor of such a dismissal here because the only factual record before the court demonstrates that application of the sentencing guidelines could well result in a relatively light sentence.

## II.    Facts and Circumstances Leading to Dismissal

"In determining whether the facts and circumstances warrant dismissal with prejudice we focus on the culpability of the conduct that led to the delay."  *United States v. Cano-Silva*, 402 F.3d 1031 (10th Cir. 2005).  "Where the delay is the result of intentional dilatory conduct, or a pattern of neglect on the part of the Government, dismissal with prejudice is the appropriate remedy. Conversely, a defendant who waits passively while the time runs has less claim to dismissal with prejudice than does a defendant who demands, but does not receive, prompt attention."  *United States v. Saltzman*, 984 F.2d 1087, 1093-94 (10th Cir. 1993) (internal

quotations omitted).  "Any such finding, suggesting something more than an isolated unwitting violation [by the government], would clearly . . . alter[] the balance."  *Taylor*, 487 U.S. at 339.

In this case, it was the government's culpability that caused the delay.  It is well established that "the Government bears the burden of ensuring the Defendant's speedy trial rights are not violated."  *United States v. Saltzman*, 984 F.2d 1087, 1093 (1993).  When the second indictment was filed here the government did not move to expedite the case.  It did not notify this court, which did not handle the case under the first indictment, that there was a potential speedy trial issue with the filing of the second indictment.  Additionally, the government did not exercise due diligence concerning the timing of the speedy trial clock.  It originally argued to this court that the speedy trial clock began anew on Count 2 when the second indictment was filed.  But, as noted in the court's prior Memorandum and Order, that interpretation is directly contrary to a Tenth Circuit case decided just last year.  When asked at the hearing what the government did to alert the court that the speedy trial clock was near expiration at any time after the second indictment was filed, the government responded only that it told the magistrate judge's staff that this was a refiling.  But the mere fact that it was a refiling provided no "heads up" concerning fast-approaching speedy trial implications, which is consistent with the government being not being aware of the true speedy trial status.  Thus, it is clear that the government did not know or research the Speedy Trial Act and it did not acknowledge to the court, once the motion to dismiss was brought, that the Speedy Trial Act time had in fact expired on this count.  And, the government failed to avail itself of any other

potential accommodations under the Act.[3] *See United States v. Giambrone*, 920 F.2d 1976 (2d Cir. 1990) ("Given the fact that only four days remained on the Speedy Trial Act clock, one might have anticipated that the government would have informed the magistrate or the court of the need for expedited scheduling."); *United States v. Caparella*, 716 F.2d 976 (2d Cir. 1983) ("Concededly, the government's failure timely to file the information or indictment in this case did not spring from any evil motive.  But, needless to say, when a defense motion, for example a motion to reduce sentence. . . is late, the government is quick to point out that time has expired. Meeting established time limitations is important and lack of attention or dilatoriness in observing them should not be encouraged by courts viewing such neglect tolerantly."); *United States v. Carreon*, 626 F.2d 528 (7th Cir. 1980) (concluding that the government was negligent when it failed to move to expedite the case in context of Sixth Amendment right to speedy trial)*; United States v. Story*, 131 F.3d 150 (9th Cir. 1997) (table opinion) (giving an example of steps the government could take to protect the speedy trial clock: "On January 4, 1995, the government filed a superceding indictment that retained the original charge and added a new charge. . . . On January 6, the government requested the court to accelerate the trial date to 'the present' because the speedy trial clock either had or was about to run. In that motion, the government suggested that should the scheduling be impossible, the court might move the trial date up and then find it necessary to delay it in the interests of justice pursuant to 18 U.S.C. § 3161(h)(8)(A).").

---

[3] For example, the government did not seek an order to exclude the time pursuant to an interests-of-justice determination under § 3161(h)(8)(A).

Moreover, defendants highlighted through cross examination and closing argument that much of the newly discovered evidence that led to the dismissal of the first indictment came from sources known to the government before even the first indictment was filed. For example, the government presented evidence that several of their informants began talking to authorities in April and May 2007. Mr. Nitz testified, however, that there was a meeting with one of the informants in October 2006, approximately two months before the first indictment. Another informant provided information after he was knowingly facing criminal charges and the Neighbors' case had been publicized. Also, while the government pointed out that the first indictment dealt with the firearms, the second indictment dealt with the grow operation and expanded the evidence against Ms. Neighbors from aiding and abetting to being an actual user in possession. But, tellingly, Mr. Nitz testified that the grow operation was discovered during two searches in December 2005 and July 2006, which was months before the first indictment.

The court does not dispute that a party cannot always control when an informant or witness begins to give relevant information. At the hearing, however, the government provided little evidence of any other information completely unknown to it, such as when a newly discovered witness shows up at a time too late to utilize him or her at a scheduled trial. The additional information based on the evidence presented at the hearing seems to stem from sources whose credibility is questionable and from information and people known to the government at a date much earlier than the day the first trial was scheduled to begin. Moreover, information Mr. Ludwig gave at the May interview is uncorroborated hearsay from another individual, Mr. Stanwix, whom the government apparently is still yet to interview.

13

The culpability of the government in this case was more inadvertent than it was the result of intentional dilatory conduct or a pattern of neglect for defendants' speedy trial rights in general.  There was no evidence of malicious intent by the government.  But, at the same time, there is little evidence of any meaningful justification for the first dismissal and no justification for the government's inaction which led to the second dismissal.  What is significant about the government's culpability here is its full responsibility for the speedy trial violation as compared to the Neighbors' complete blamelessness.  *Compare Taylor*, 487 U.S. at 339 (pointing out the defendant's culpability; "Then there is the fact of respondent's failure to appear. The Government was prepared to go to trial on the 69th day of the indictment-to-trial period, and it was respondent, not the prosecution, who prevented the trial from going forward in a timely fashion."); *Saltzman*, 984 F.2d at 1093 ("[T]he record indicates the delays were equally attributable to both the defense counsel and the Government"), *with United States v. Johnson*, 120 F.3d 1107 (10th Cir. 1997) (remanding to the trial court to determine whether to dismiss with or without prejudice and "observ[ing] . . . that Ms. Johnson bears no responsibility for the circumstances leading to the Speedy Trial Act violation, and that she properly asserted her rights under the Act").  The factual record in this case demonstrates that the defendants were prepared to go to trial in May of 2007 on the first indictment and they promptly asserted their speedy trial rights on the second indictment.

The only evidence the government presented as to the Neighbors' culpability was that they would not acquiesce in a continuance under the first indictment and that they also could have notified the court of potential speedy trial issues.  This does not, however, establish their

culpability.  The government could have filed a motion for a continuance without their

agreement.  And, when the government filed the second indictment, it could have asked the court

to expedite the case or simultaneously filed a motion to exclude the time in the interests of

justice.  *See* 18 U.S.C. § 3161(h)(8)(A). The prosecutor remained the same under both

indictments, so she was familiar with the case.  The defendants, on the other hand, were

represented by different counsel under the second indictment than the first.  Both attorneys had

little familiarity with the case in comparison to the prosecutor.  In light of these facts, the

government should have alerted the court to the speedy trial implications and moved to expedite

the case, particularly where the original case was before a different district judge.  Between the

government and defendants, it was the government which had the responsibility to bring

defendants to trial within the speedy trial time, and the court finds that only the government's

conduct was culpable in leading to the speedy trial violation.

The length of the delay also is to be considered when looking at the facts and

circumstances that led to the delay.  *United States v. Taylor*, 487 U.S. 326 (1988).[4]  In the

previous Memorandum and Order the delay was calculated by defendants at fifteen days and the

clerk's office calculation through CM/ECF showed a nine-day delay.   While this is a

---

[4] The Tenth Circuit has stated that "[w]hen the charges are serious, courts should impose the sanction of dismissal with prejudice only for a correspondingly serious delay, especially in the absence of a showing of prejudice."  *Saltzman*, 984 F.2d at 1093.  This court distinguishes this case because the weight accorded to the seriousness of the offense was lessened by the evaluation of the applicable advisory sentencing guidelines, there has been prejudice shown in this case, and there would likely have been a serious delay if defendants would have sat on their rights instead of so promptly bringing their motion.

consideration, this court also considers that defendants did not sit on their rights and wait to file the motion to dismiss until a much later date, for example, after all trial preparations had been completed.  Defendants likely could have extended the delay as a result of the government's misunderstanding of the law that the speedy trial clock had started over;  but for the filing of the motion to dismiss, the delay would have likely extended beyond the nine or fifteen days. The trial date has not yet been set, so there is no definitive answer to how long the delay ultimately would have been.

In sum, the court finds that this factor weighs slightly in favor of dismissal with prejudice. While the court does not find that any wilful prosecutorial misconduct led to the speedy trial violation, it was a result of the government's inadvertence and ignorance of the implications of the first dismissal (at its own behest) on the speedy trial clock.  Furthermore, the "additional evidence" which was allegedly the whole basis for dismissing the first indictment and tolling the speedy trial time between indictments, is of somewhat questionable probative value, at least as based on the evidence presented at the hearing before this court.[5]

---

[5] The court acknowledges that if the government's failure to move to expedite the trial was a result of prosecutorial misconduct, this would strongly favor dismissal with prejudice, more so than the government's negligence. *Cano-Silva* at 1036 (If the violation is the result of "intentional dilatory conduct, or a pattern of neglect on the part of the Government, dismissal with prejudice is the appropriate remedy.").  Where the government alone is at fault, however, even negligence can weigh in favor of dismissal with prejudice, albeit not as heavily as prosecutorial misconduct does.

### III.   Adverse Impact of Reprosecution on Administration of Justice and Speedy Trial Act, Including Prejudice to Defendants

The court's rationale concerning the facts and circumstances leading to dismissal is perhaps most pertinent in light of the third factor the court must consider, which is the adverse impact reprosecution would have on the administration of justice and the Speedy Trial Act, including the prejudice to the Neighbors.  If the court were to dismiss Count 2 without prejudice and permit it to be refiled, it would negatively affect the administration of justice because the Neighbors would face their third prosecution on the same charge for reasons which are attributable to no fault of their own.  The first indictment was dismissed because "additional evidence" allegedly became available.  Without second guessing that judge's decision to dismiss without prejudice because he did so based on proffers of what was expected to occur and not the record of what actually transpired thereafter, the court finds that the showing at the hearing in front of this court demonstrated that the substance of this "additional evidence" was minimally probative and perhaps within the reach of the government at an earlier date, all as discussed previously.  The second indictment has now been dismissed by this court as mandated by the Speedy Trial Act as a result of the government's failure to ensure that the defendants' speedy trial rights were not violated.  Now, if the court were to dismiss this charge without prejudice the defendants would be subjected to prosecution of this charge yet a third time.

Defendants would suffer prejudice related to the trial if reprosecution were allowed.[6] They would be forced to endure a third time making an "initial appearance" before the magistrate judge, a third set of pre-trial preparations, and a trial at a date much later than their initial trial on this charge was scheduled (a trial for which they were ready to proceed).  Also, defendants may not even be able to have the same counsel if there is yet another delay, as evidenced by the change of counsel after the second indictment.[7]

Defendants also would suffer prejudice from the liberty restrictions and negative publicity, including negative effects to their business, financial, and personal life.  "Inordinate delay between public charge and trial, wholly aside from possible prejudice to a defense on the

_____

[6] Admittedly, defendants did not allege prejudice to specific tactics at their trial, such as when a witness is no longer available.  *Cf. Abdush-Shakur*, 465 F.3d at 464 ("There is no evidence the defendant lost a crucial witness because of the delay, nor did he offer any evidence as to how the absence of this witness testimony prejudiced his case.").  Nor did they allege the length of the delay is presumptively extreme.  *Cf. United States v. Jones*, 162 F.3d 1174 (10th Cir. 1998) ("[T]he length of the delay [between indictment and trial] is a barometer of the prejudice suffered by the defendant.").  However, based on the notion from the Supreme Court that "[b]ecause 'prejudice' may take many forms, such determinations must be made on a case-by-case basis in the light of the facts," the subsequent discussion shows the other ways that defendants would be prejudiced by yet another reprosecution. *See Taylor*, 487 U.S. at 341, n.13.  Also, as previously discussed, defendants should not be penalized because they promptly brought the motion to dismiss as opposed to letting time accrue and then alleging the length of the delay was extreme.

[7] Defendants hired their own counsel after the first indictment.  Mr. Neighbors testified that the agreement with that attorney was for $5,000, which he now has been unable to pay in full.  He also testified that his hired attorney was ready to defend him at trial before the first indictment was dismissed.  After defendants were arrested pursuant to the second indictment, they were appointed counsel different from their hired counsel.  The court finds these circumstances relevant to the possible reprosecution on a third indictment.  Due to the delay, there is no guarantee that current counsel would be available and able to represent the Neighbors at yet another trial if they were indicted on the charge in Count 2 once again.

merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *Taylor*, 487 U.S. at 340 (internal quotations and citations omitted). "We do not decide that as a matter of law there could never be any prejudice to a defendant whose speedy trial rights were violated, but who was also being held on other charges. Because 'prejudice' may take many forms, such determinations must be made on a case-by-case basis in the light of the facts." *Id.* at 341, n.13. Defendants have complied with conditions of their bond, so they have already endured restrictions on their freedom. *See Biggs*, 419 F.Supp.2d 1277 (granting motion to dismiss with prejudice as to two of the defendants who had complied with their bond restrictions but not the third defendant who had not complied and therefore suffered no prejudice based on those restrictions). The court finds that based on this compliance, the prejudice from the liberty restrictions would continue for a prolonged period of time beyond the time of the trial on counts 1, 3, and 4  because the government would receive a new seventy day speedy trial clock upon reindictment of that count in this context.

If the government is permitted to refile those charges, defendants will likely have to be arrested for a third time at their home or business. As pointed out by defense counsel, this will subject them not only to the distress of yet a third arrest, but also the possibility of another search incident to that arrest.[8] This could cause even greater prejudice to these defendants more so than

---

[8] As to the implications of a rearrest, the government argued at the hearing that in the initial rearrest pursuant to the second indictment, defendants were not treated any differently

the average defendant because there are two investigations on unrelated charges.  Also,

defendants presented evidence of financial burdens resulting from the indictments, such as that

Mr. Neighbors is still in debt to his previous lawyer and that both had to have attorneys

appointed after the second indictment after hiring their own in connection with the first

indictment.  There also was evidence that only after negative publicity and passage of time did

government informants begin talking.  This is further evidence of prejudice defendants will

continue to suffer for a prolonged period due to the delay.  These, along with all the restrictions

endured as a result of the bond conditions, show defendants would be prejudiced if reprosecution

were allowed.

Here, defendants have shown prejudice "aside from possible prejudice to a defense on the

merits," *see Taylor*, 487 U.S. at 340, because the prolonged restrictions associated with a third

indictment demonstrate "specific prejudice."  *See Saltzman*, 984 F.2d at 1094 ("[T]he defendant

has a burden under the Act to show specific prejudice other than that occasioned by the original

filing.").  Certainly, dismissal without prejudice does not necessarily make the Act meaningless.

*See, e.g.*, *Cano-Silva*, 402 F.3d at 1035 ("While dismissal with prejudice is obviously the more

severe sanction, a dismissal without prejudice still requires re-indictment, may expose the

government to statute of limitations difficulties, and generally makes prosecution less likely.").

---

from any other defendant.  In closing argument, the government even stated that there are
procedures and processes that defendants must go through anytime someone is charged with
criminal activity. Therefore, the court finds the circumstances of the rearrest relevant because
if another indictment would be brought, defendants would have to be treated like any other
defendant once again.  The court, therefore, assumes defendants would have to endure the
same circumstances.

This, however, pales in comparison to what defendants would be forced to undergo by enduring a third indictment for the same offense even though the violation was caused by no fault of their own. Defendants would be forced to endure even lengthier times before trial on this offense, as the government gets a new seventy-day clock where the dismissal is made upon motion of the defendant. It would subvert the purpose of the Speedy Trial Act to allow the government to bring this charge for the third time when it is the only culpable party. This court concludes, therefore, that to allow the government to indict defendants for a third time would negatively affect the administration of the Speedy Trial Act.

### IV.    Balancing of the Factors

In sum, the court finds that although the charged offense is serious, the seriousness of that offense is ameliorated by the likely application of the sentencing guidelines based on the evidence presented at the hearing on the current motion. Additionally, the facts and circumstances leading to dismissal demonstrate, first, that the first indictment was dismissed without prejudice entirely at the government's behest under a justification that in retrospect does not seem very compelling and, second, that dismissal of the second indictment was entirely attributable to the culpability of the government and not at all to the defendants. Under these circumstances, reprosecution would negatively affect the administration of justice and the Speedy Trial Act and meaningfully prejudice the defendants by subjecting them to yet a third prosecution on the same offense through no fault of their own. It is this unique combination of factors—that defendants could be subjected to a third prosecution, through no fault of their own,

on a charge that appears would not involve a very serious sentence—that demonstrates that this is one of the more egregious cases beyond the mere fact that "a violation [of the Speedy Trial Act] has taken place." *United States v. Cano-Silva*, 402 F.3d 1031, 1035 (10th Cir. 2005). The court does not believe that dismissal with prejudice in this case would "unduly impair[] the enforcement of federal criminal laws."[9] *Abdush-Shakur*, 465 F.3d at 462. Instead, this is a case in which dismissal with prejudice will ensure the fair administration of justice and the Speedy Trial Act.

**IT IS THEREFORE ORDERED BY THE COURT** that the Motion to Dismiss Count 2 (doc. 24) previously granted is now granted **WITH PREJUDICE**.

**IT IS SO ORDERED** this 21st day of December, 2007.

s/John W. Lungstrum
John W. Lungstrum
United States District Judge

---

[9] Without making any preconceived determination of defendants' guilt, or lack thereof, the court does note that the government suffers little prejudice from the dismissal of this count. The government will still be able to prosecute defendants on the other three counts of the second indictment. And if the defendants are found guilty, then the possession of firearms may conceivably contribute to a higher sentence when the factors enumerated in 18 U.S.C. § 3553 are considered.